**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CURTIS L. DURNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 4154** |
| | ) | |
| **FAMILY GUIDANCE CENTERS, INC.** | ) | **Judge Rebecca R. Pallmeyer** |
| **f/k/a SPECIALIZED ASSISTANCE** | ) | |
| **SERVICES, NFP** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Curtis Durns was employed by Defendant Family Guidance Centers, Inc. ("FGC") for thirty-three years as a Level III Counselor.[1]  In 2017, Durns's supervisor began to identify deficiencies in Durns's work performance, resulting in multiple disciplinary actions between April 2017 and February 2018.  In the spring of 2018, Durns was diagnosed with prostate cancer and took medical leave for surgery.  Three days after returning from leave, Durns was terminated. Durns then filed suit in this court, alleging that FGC violated his rights under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").  Specifically, Durns claims that FGC (1) interfered with the lawful exercise of his FMLA rights; (2) retaliated in violation of the FMLA; (3) discriminated against him in violation of the ADA; and (4) retaliated in violation of the ADA [1].  Defendant now moves for summary judgment on all counts.  For the reasons discussed below, Defendant's motion [30] is denied in part and granted in part.

---

[1]     Defendant was formerly known as Specialized Assistance Services, NFP, and merged with FGC around January 4, 2019.  (Def.'s L.R. 56.1 Statement of Facts [32] at 1 n.2).

**BACKGROUND[2]**

### 1. Durns's Employment at FGC

Defendant FGC is a not-for-profit organization that provides treatment for substance use disorders, including group and individual counseling.[3]  (Def.'s L.R. 56.1 Statement of Facts [32] (hereinafter "Def.'s SOF") ¶ 2.)  Plaintiff Durns worked for FGC for thirty-three years as a Level III Counselor.  (Pl.'s L.R. 56.1 Statement of Additional Facts [36] (hereinafter after "Pl.'s SOF") ¶ 2.) His duties included counseling patients with substance abuse issues and documenting his counseling work.  (Def.'s SOF ¶ 10.)  FGC requires this documentation because it is "critical" to tracking its patients' progress, providing adequate care, and ensuring regulatory compliance.  (*Id.*) In February 2017, Erving Lugo became Program Director at FGC and was Durns's immediate supervisor until Durns's termination in June 2018.  (Def.'s SOF ¶ 8; Lugo Decl., Ex. 2 to Def.'s SOF [32-3] (hereinafter "Lugo Decl.") ¶¶ 2–3.)

Beginning in April 2017, and before anyone at FGC learned of Durns's cancer or medical leave request, Durns was subject to numerous disciplinary actions.   About two months after becoming Program Director, Lugo conducted an audit of Durns's patient charts and discovered problems with his documentation.  (Def.'s SOF ¶ 9.)  FGC has different types of patient charts (such as charts for orientation, assessments, and treatment plans); each type of chart has different documentation requirements.  (Lugo Dep., Ex. 6 to Def.'s SOF [32-7] (hereinafter "Lugo Dep.") at 17:3–10.)  When conducting an audit, Lugo checks the counselor's charts to determine whether they complied with these requirements.  (*Id.*)  In a Clinical Supervisor Report dated April 5, 2017, Lugo noted that he had reviewed ten of Durns's cases, and in seven, the records were

---

[2]     FGC takes issue with several of Durns's responses to its Local Rule 56.1 statement of facts and with all of his additional facts.  (Def.'s Reply in Supp. of Summ. J. [38] at 2–6, 8.)  In reviewing the background and deciding FGC's motion for summary judgment, the court considers only material facts supported by admissible record evidence.  *See Stinson v. Cty. of Cook*, No. 18 C 1614, 2020 WL 6870816, at *1 n.1 (N.D. Ill. Nov. 23, 2020).

[3]     FGC ABOUT US, http://www.fgcinc.org/about-us/ (last visited September 28, 2021).

noncompliant. (Pl.'s Resp. to Def.'s L.R. 56.1 Statement of Facts [35] (hereinafter "Pl.'s Resp.") ¶ 9); April 5, 2017 Clinical Supervisor Report, Ex. 7 to Def.'s SOF [32-8] (hereinafter "April 2017 Report").)  For example, according to the report, Lugo reviewed the treatment plans for two of Durns's cases and found that the chart for one case "is not complete to standard" and "out of date." (April 2017 Report at 2.)  Although Durns signed the Clinical Supervisor Report on April 5, 2017, he disagreed with Lugo's assessment, and testified at his deposition that most of his work was timely completed.  (Durns Dep., Ex. 1 to Def.'s SOF [32-2] (hereinafter "Durns Dep.") at 28:10–29:16.).  Durns and Lugo also discussed the report; the record does not make clear when this discussion occurred or what issues were discussed. (*Id.* at 28:16–19.)

Two months later, in June 2017, Lugo again notified Durns of his deficient performance by issuing an Employee Warning Report.  (Def.'s SOF ¶ 10.)  According to Lugo, the "main issue" was that although Durns appeared to be meeting with patients, Lugo "found almost no documentation of those meetings."  (Lugo Decl. ¶ 5.)  The warning letter to Durns stated that Durns "maintained conversational[sic] with patient[s] throughout the day and week," but failed to record these sessions; "[a]ccording[ ] to the electronic files (SAMMS) you have been underperforming your duties as a counselor."  (June 12, 2017 Employee Warning Report, Ex. 8 to Def.'s SOF [32-9] (hereinafter "June 2017 Warning") at 3.)  The warning documented Lugo's belief that Durns's performance had declined since the April audit and stated that Durns failed to maintain up-to-date records, process the required documentation, or ensure that patients were receiving monthly counseling sessions. (*Id.*)

So far as the record shows, Durns did not challenge these criticisms.  He signed the warning and checked the box for "I concur with the Company's statement," and he does not dispute FGC's assertion that he "agreed with Lugo's assessment of [his] poor performance in June 2017." (*Id.* at 2; Def.'s SOF ¶ 11.)  At Durns's deposition, the following exchange occurred:

> Q.     And, again, this [the Employee Warning Report] is Erving Lugo, essentially, saying that you were told that your performance needed to improve in April 2017, but it didn't improve as of January – er, excuse me – as of June 2017, correct?

A.      Yes.
Q.      Okay.  And you agreed with that, right?
A.      Yes.

(Durns Dep. at 42:7–14.)  In any event, in October 2017, Durns was disciplined again: FGC suspended Durns without pay for seven days after he engaged in a verbal and physical altercation with a patient.  (Def.'s SOF ¶ 13; October 31, 2017 Employee Suspension Report, Ex. 9 to Def.'s SOF [32-10].)

A final pre-termination disciplinary action occurred in February 2018, when Durns was suspended without pay for 15 days.  (Def.'s SOF ¶ 15.)  The suspension resulted from another review of Durns's files by Lugo, after which Lugo concluded that Durns had not improved his documentation issues.  (*Id.* ¶ 17.)  The review also led Lugo to believe that, even though Durns was required to see patients at least once a month, he had failed to see certain patients for more than six months.  (*Id.*)  Lugo therefore recommended a suspension.  (*Id.*)  The February 2018 Suspension Report described the following infractions: Durns did not comply with the June 2017 Employee Warning Report; "has not improved in data entry," and has not "made any attempts to see his patients for required sessions."  (February 15, 2018 Employee Suspension Report, Ex. 10 to Def.'s SOF [32-11] (hereinafter "February 2018 Suspension").)  The notice also informed Durns that upon his return from the 15-day suspension, "you will be required to provide seven (7) individual session[s] per day consist[sic] of individual session, CSRs, assessments, annual anniversary enrollment session, toxicology.  This will include 5hrs. of billable time.  You will be monitor[sic] for one month of performance, fail to comply can result to termination of employment." (*Id.*)

Durns took issue with the statements in the suspension notice.  (Pl.'s Resp.  ¶ 18.)  He did not agree with Lugo's conclusion that he was "not doing the work"; instead Durns testified at his deposition that he "was doing everything. I did not have as much time as other people did to see patients and everything, because my first two hours of the day was taken up at the desk." (Durns Dep. at 50:22–51:1, 51:12–52:18.)  Specifically, Durns noted that he, unlike other

counselors, had desk duty from 7:00 to 9:00 in the morning, where he worked in the reception area and signed in patients. (*Id.* at 38:20–39:18, 52:10–24.) Durns also testified that he had improved his data entry since the June 2017 Warning, though he agreed that Lugo's statement in the February 2018 suspension notice was accurate. (*Id.* at 51:9–52:6.) Durns believed "the issue is that [he] didn't have as much time as other people[.]" (*Id.* at 52:1–6.) Durns signed the February 2018 Suspension Report, and instructed Lugo to write "[C]ounselor is signing infraction but does not agree with statement[.] [C]ounselor feels supervisor being injustices[sic]." (Pl.'s Resp. ¶ 18; February 2018 Suspension.)

## 2. Performance After the February 2018 Suspension

Durns's suspension began in late February 2018. (February 2018 Suspension; Def.'s SOF ¶ 15.) During his suspension, around March 8, 2018, Durns was diagnosed with prostate cancer. (Def.'s SOF ¶ 21.) Durns returned from his suspension on March 13, 2018, but did not immediately disclose his cancer diagnosis to anyone at FGC. (*Id.* ¶¶ 7, 22.) Durns first informed FGC employees of his diagnosis on April 16, 2018, when he requested FMLA leave; as discussed below, the parties dispute whether Lugo also learned of Durns's diagnosis on that date. (*Id.* ¶ 7; Pl.'s SOF ¶ 1.)

Between the time that Durns returned from suspension and the date on which he requested FMLA leave, he was not subject to any discipline. (Def.'s SOF ¶ 22.) But at some point after his return from suspension, Durns began providing Lugo with his patient treatment plans for Lugo's review and approval. (Durns Dep. at 59:4–16.) On March 23, 2018, Lugo sent Durns two emails about Durns's performance in documenting the treatment plans. (*Id.* at 59:4–60:11, 61:11–62:6.) At summary judgment, the only mention of this e-mail exchange is implicit. In its reply brief, FGC offers as evidence Durns's testimony (apparently in reference to these e-mails) that Lugo communicated that Durns's performance "wasn't good enough." (Def.'s Reply in Supp. of Summ. J. (hereinafter "Def.'s Reply") [38] at 4.) The e-mails themselves are not in the record, but Durns testified at his deposition that in one of them, Lugo said Durns needed to collect

better patient data, which Durns interpreted as a statement that his data recording "wasn't good enough for [Lugo]." (Durns Dep. at 60:5–61:7.) Durns did not specifically recall the issues raised in the second e-mail. (*Id.* at 61:11–62:1.) In Durns's own view, his treatment plans "were done," and Lugo was "picking on [him]." (*Id.* at 61:15–23.) Lugo acknowledged that he signed off on Durns's treatment plans despite their shortcomings because Durns had "showed some improvement, but still needed more work." (Lugo Dep. at 36:15–23.)

The parties disagree on what Lugo observed after Durns returned from suspension. Lugo's office was across from Durns's, and according to Lugo, he was able to "see the amount of patients in [Durns's] office, the amount of conversation that they're having, the amount of socializing they're having." (Def.'s SOF ¶ 20; Lugo Dep. at 33:19–21.) He was also able to check Durns's documentation electronically through the computer in his office; he testified that, after seeing patients in Durns's office, "if I don't get the file within the next two or three days -- no date on it -- very late entry." (Lugo Decl. ¶ 10; Lugo Dep. at 33:22–23.) Based on his observations, Lugo concluded that Durns's documentation had not improved after suspension: "[I]t appeared that Durns was seeing many more patients than the number of charts he was actually completing. Durns's documentation that did exist was rarely completed properly and with the level of detail I expected." (Lugo Decl. ¶ 10.) Lugo does not offer examples of how this documentation was deficient, nor did FGC provide this documentation on summary judgment.

Durns disputes Lugo's testimony and asserts that FGC provided "no evidence" in support of Lugo's criticisms. (Pl.'s Resp. ¶ 20.) At his deposition, Durns acknowledged that FGC's shared computer system enabled Lugo to "go into [Durns's] charts." (Durns. Dep. at 59:19–60:4.) He also acknowledged that Lugo was dissatisfied with his work performance as of March 23, 2018 (when Lugo sent the two e-mails about his treatment charts), and that nothing changed in how Lugo treated him before and after his cancer diagnosis, but characterized Lugo as "picking on [him]." (Def.'s SOF ¶ 28; Durns Dep. at 62:7–63:17.) Durns points out that the February 2018 Suspension Report stated that Durns would be monitored "for one month of performance" when

6

he returned from suspension and that "fail[ure] to comply can result [in] termination of employment." (February 2018 Suspension.) Under this notice, a thirty-day review period began on March 13, 2018 (when Durns returned to work) and ended on April 12, 2018. (Pl.'s Resp. ¶ 26.) Because FGC did not terminate him or issue any disciplinary action after that date, Durns contends, FGC effectively communicated that Durns's post-suspension performance was acceptable. (*Id.* ¶¶ 26–27, 31.)

FGC discounts the significance of the thirty-day period, asserting that it does not follow strict timelines when reviewing performances or issuing discipline. (Def.'s Reply at 7.) In support, FGC claims that the review leading to the February 2018 suspension was an untimely "follow-up" to the June 2017 warning. (*Id.*) The record does not directly support this contention. FGC points to the February 2018 suspension notice itself, which stated that the relevant infraction was "WORK PERFORMANCE 6 MONTH REVIEW." (February 2018 Suspension.) The section detailing the infraction stated that Durns had not complied with the Employee Warning Report imposed in June 2017. (*Id.*) Lugo explained that although he conducted the review leading to Durns's suspension eight months after the June 2017 report, it was referred to as a "six-month review" because Lugo had reviewed six months of Durns's workload. (Lugo Dep. at 27:2–12, 27:23-28:7.) FGC's statement of facts, however, asserts (consistent with Lugo's deposition testimony) that the review arose from Lugo's concerns about Durns's performance and Lugo's review of all staff members under his supervision. (Def.'s SOF ¶ 17; Lugo Dep. at 27:13–22, 29:4–11.) FGC points to no testimony suggesting the June 2017 warning was the catalyst. Additionally, Lugo and FGC's Chief Executive Officer Dr. Ciunial Lewis (who started this job when Durns was on FMLA leave) both testified that, even though Lugo was tasked with regularly supervising and reviewing his staff members, it could take up to three or six months for him to notice performance deficiencies. (Lugo Dep. at 30:16–31:25; Lewis Dep. at 16:16–20:12; Def.'s SOF ¶ 30.)

Though FGC does not cite to any official policies when discussing its approach to issuing discipline, the court notes that FGC submitted two discipline-related policies on summary judgment. FGC's Disciplinary Action policy governs suspensions and warnings; as Durns points out, it restricts suspensions to 10 days (he was suspended for 15), but as FGC points out, the policy gives FGC discretion to administer discipline in any manner. (Def.'s SOF ¶ 53; Pl.'s Resp. ¶ 53; Ex 13 to Def.'s SOF [32-14].) The parties do not clarify how their dispute over the language of this policy (which addresses Durns's pre-leave suspension) affects their arguments about Durns's post-leave termination. FGC's Probationary Periods policy allows for a 90-day disciplinary probation; the parties agree that Durns was not placed on probation in 2017 or 2018. (Def.'s SOF ¶ 53; Pl.'s Resp. ¶ 53; Ex 14 to Def.'s SOF [32-15].) Again, though the parties fail to clarify the significance of Durns's lack of probation, the court notes that if Durns had been placed on probation upon return from suspension (March 13) or leave (June 4), his termination on June 7 would have prematurely cut short that 90-day period. Lugo testified that he never placed Durns on a disciplinary probationary period, but instead "put him on monitoring."[4] (Lugo Dep. at 43:17–23.) He described monitoring as "[o]bservation of [Durns's] performance, observing his overall attitude while he's continuing to improve." (*Id.* at 43:24–44:1.) Lugo did not clarify when this monitoring occurred, but after being shown the February 2018 suspension notice, he confirmed that the monitoring referenced on the notice would have been for one month after Durns's return from suspension. (*Id.* at 44:3–7, 52:20–52:8.)

### 3.  FMLA Leave and Termination

The disputed review period ended without any further discipline on April 12, 2018. (Pl.'s Resp. ¶ 26.) Four days later, on April 16, 2018, Durns requested and was granted FMLA leave,

---

[4]     The court notes that Dr. Lewis was also asked about this policy at her deposition. However, because she came on board with FGC while Durns was on FMLA leave, her testimony about his pre-leave monitoring, or about the application of FGC's policies during that monitoring, is hearsay.

to begin on April 25 and run through June 1, with Durns returning on June 4. (Def.'s SOF ¶ 23.) Durns emailed Lugo, Anthony Abram (the HR Director), and Doris Reynolds (the former president and CEO) with his leave request, and testified that he "asked the human resource guy, Tony Abram . . . . about leave." (E-Mail Request for FMLA Leave, Ex. 4 to Def.'s SOF [32-5] (hereinafter "FMLA E-Mail"); FMLA Approval and Certification Documentation, Ex. 5 to Def.'s SOF [32-6] (hereinafter "FMLA Approval"); Durns Dep. at 25:19–22, 110:22–23.) Durns's FMLA request e-mail only identified "medical purposes" as the reason for seeking leave. (FMLA E-Mail.) FGC's approval of this request was documented in a memorandum from Abram; the approval included certification from Durns's health care provider that he had prostate cancer, was scheduled for surgery, and would be unable to lift or push objects heavier than ten pounds for five or six weeks after surgery. (FMLA Approval at 2, 4–5.) Lugo is not copied on the approval, and confirmed that he was not "in any way" involved in approving Durns's request for leave. (Lugo Dep. at 39:8–10.)

Durns asserts that Lugo did not learn of his cancer diagnosis until after Durns returned from leave in June; he points to Lugo's deposition testimony in support of this assertion. (Pl.'s SOF ¶ 1 (citing Lugo Dep. at 37:9–38:8).) Lugo testified that he "was not informed [that Durns had a disability or health condition] up until the date that [Durns] sent out an email." (Lugo Dep. at 37:9–12.) Lugo further stated that he "didn't know prior to that," and that "[a]ll [he] got from [Durns]" was that he was going for a surgery . . . [Lugo did not] even know that [Durns] had a condition that had been filed." (Lugo Dep. at 37:9–17.) Lugo also testified that he learned what Durns's condition was "[a]fter the fact," meaning "[w]hen [Durns] returned from FMLA," and that Abram was the one who told him about Durns's health condition. (*Id.* at 37:18–38:8.) He also stated that all Abram "told me was that [Durns was] going to be out on FMLA for prostate cancer or treatment." (*Id.* at 38:10–13.) In response, FGC argues this deposition testimony is "too vague" to support Durns's assertion, but does not disclose when Lugo did in fact learn of Durns's diagnosis. (Def.'s Resp. to Pl.'s L.R. 56.1 Statement of Additional Facts ¶ 1.)

Durns began his FMLA leave on April 24, 2018 and returned to work on June 4, 2018. (Def.'s SOF ¶¶ 24, 32.) Upon his return, Durns was medically restricted from lifting or pushing anything heavier than ten pounds. (*Id.* ¶ 33.) This was the only accommodation Durns needed; other than the light-duty restriction, he was able to do everything the job required. (Durns Dep. at 17:1–9.) FGC did not require Durns to lift or push anything heavier than ten pounds when he returned to work. (Def.'s SOF ¶ 34.) Exactly how Durns informed FGC of this lifting/pushing restriction is not apparent. The documentation from Durns's doctor (which was attached to FGC's approval of Durns's FMLA leave) notes the restriction, though Durns seems to assert that he requested accommodation the same day he returned from leave. (FMLA Approval at 5; Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Mem.") [34] at 4.) Lugo testified that he was not aware of whether Durns's health condition limited his ability to perform his job, or whether Durns required any workplace accommodations. (Lugo Dep. at 39:23–40:4.)

Durns was back on the job for no more than two or three days when Lugo made the decision on June 6, 2018 to recommend his termination. (Lugo's Decl. ¶ 11.) According to Lugo, Durns's performance in those few days was deficient. In his declaration, Lugo testified that when Durns returned from FMLA leave, "[i]t appeared that he got right back into the flow of his job and that he was seeing an appropriate number of patients." (*Id.*) But Lugo explained that "when I checked whether he was documenting his work for the patients . . . I could not find the documentation I expected to see." (*Id.*) At his deposition, Lugo testified that during those days, "[Durns] was not performing. He was socializing. He had plenty of patients come to his office–or had in his office–to conduct his work and to provide the data that he conducted the work, and nothing." (Lugo Dep. at 45:12–16.) By "nothing," Lugo meant: "[O]nce I reviewed SAMMs, which is where we record all of our documentation, his records showed nothing was entered within those two days. When they were checked again, they were all late entries." (*Id.* at 52:4–8.) According to Lugo, these deficiencies led to Durns's termination. Lugo stated that these were the same problems that led to Durns's previous discipline, and on June 6, 2018, Lugo "came to the

conclusion—after giving Durns more than a year to improve and resolve his performance deficiencies—that Durns would never change his behavior and resolve those deficiencies." (Lugo Decl. ¶ 11.) Lugo explained:

> [Durns is] a seasoned counselor. He knows already what needed to be addressed prior to him leaving, prior to being suspended. He returned and continued to do the same conduct. He left on his medical leave, came back, maintained the same conduct. I recognized he wasn't going to change, so I decided to go get it done now and that's it.

(Lugo Dep. at 45:23–46:4.)

Durns disputes this testimony, asserting that he "was performing his job duties following his suspension and his return to work after his FMLA leave" and that FGC once again provided "no evidence" for its assertion that his performance was deficient. (Pl.'s Resp. ¶ 36.) According to Durns, he only saw Lugo "in passing" after his return from FMLA leave, and he did not submit any treatment plans for review or approval after his return. (Durns Dep. at 69:6–12.) Durns also testified that he "wasn't having any problems with [his] work," between his leave request and his termination, and further explained that, by this, he meant that no one at FGC informed him that his performance was deficient during this time. (*Id.* at 71:6–15.) Durns himself offered this description of his performance:

> Q.      Do you think that you fixed any performance issues in that time frame, between April 16th [the date Durns requested FMLA leave] and the termination date?
> A.      I know it was nine days that I was -- before I had surgery -- so, I can't say. I fixed things. I was still doing work.
> Q.      Right. I think a little bit of that may have broken up on my end. I think you said you can't say that you fixed things. Is that right?
> A.      Right.
> Q.      Okay.
> A.      I was continuing to work. I don't know what I fixed.

(*Id.* at 72:1–13.)

Lugo made the decision to recommend Durns's termination on June 6, 2018. (Lugo's Decl. ¶ 11.) Lugo's supervisor, Joseph Thomas, also agreed to recommend termination, and Dr. Lewis, FGC's executive officer, approved the recommendation. (Def.'s SOF ¶ 37; Lewis Dep. at 31:13–32:8.) Durns was terminated on June 7, 2018. (Def.'s SOF ¶ 37.) The termination letter

identified the reason for termination as "failing to ensure caseload report summaries were accurately completed and submitted in a timely matter[sic]." (Termination Letter, Ex. 12 to Def.'s SOF [32-13] (hereinafter "Termination Letter").) Following his termination, Durns filed an administrative charge of discrimination with the Illinois Department of Human Rights on September 18, 2018. (Def.'s SOF ¶ 4; EEOC Charge, Ex. 3 to Def.'s SOF [32-4] (hereinafter "EEOC Charge").) The charge alleges discrimination based on retaliation and disability in violation of the ADA; it makes no mention of a failure to accommodate Durns's ten-pound lifting restriction. (EEOC Charge.)

On June 20, 2019, Durns filed suit in this court. (Pl.'s Compl. [1] (hereinafter "Compl.").) He alleges that FGC terminated him in retaliation for having engaged in protected activity under the FMLA (taking and requesting FMLA leave) and under the ADA (utilizing FMLA leave and requesting reasonable accommodation). He also claims that FGC interfered with the lawful exercise of his FMLA rights and discriminated against him in violation of the ADA. Defendant now moves for summary judgment on all claims [30].

## DISCUSSION

Summary judgment is appropriate only "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Abrego v. Wilkie*, 907 F.3d 1004, 1011 (7th Cir. 2018) (quoting *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)). The moving party bears the burden of "identify[ing] the particular portions of the record . . . 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If that burden is met, the non-moving party must then "set forth specific facts showing a genuine issue for trial." *Id.* at 1012. The court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See id.* at 1011.

1. **FMLA Retaliation**

There are two types of claims under the FMLA: interference and retaliation. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights, or "discharge or in any other manner discriminate against an individual" in retaliation for exercising any FMLA rights. *Id.* (quoting 29 U.S.C. § 2615(a)(1), (2)). Durns brings both types of FMLA claims. The court first considers Durns's claim that FGC terminated him in retaliation for requesting and taking FMLA leave. Retaliation under the FMLA requires that: "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). At summary judgment, courts "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)). The parties agree that Durns's termination was an adverse action and that his request for and utilization of FMLA leave were protected activities. (Pl.'s Mem. at 4; Def.'s Mem at 4–5.)

The central issue is whether Durns's protected activity caused his termination. FGC argues that Durns must establish "but-for" causation—that is, that but for his protected activity, Defendant would not have terminated him. (Def.'s Mem. in Supp. Of Mot. for Summ. J. [30] (hereinafter "Def.'s Mem") at 4.); *see Univ. of Tex. Sw. Med. Cts. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that but-for causation is the standard for a claim of retaliation in violation of Title VII). Durns appears to concede this argument (Pl.'s Mem. at 4), but as this court reads the caselaw, a claim of FMLA retaliation requires only that "the protected conduct was a substantial or motivating factor in the employer's decision," while an ADA retaliation claim requires a showing of but-for causation. *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting *Lewis v. Sch. Dist. # 70,* 523 F.3d 730, 741–42 (7th Cir. 2008)) (FMLA retaliation); *see Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (ADA retaliation). The

Seventh Circuit has nevertheless analyzed ADA and FMLA retaliation claims under the same framework, *see Freelain*, 888 F.3d at 900, albeit without overturning relevant precedents. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014); *see also Haworth v. Round Lake Area Sch., Cmty. Unit Sch. Dist. 116*, No. 17 C 7038, 2019 WL 3080928, at *5 n.2 (N.D. Ill. July 15, 2019) (collecting cases from this district applying the substantial factor test). The court therefore considers here whether a reasonable jury could find that Durns's FMLA leave was a substantial or motivating factor in the decision to terminate him. It is a close question on this record, but drawing inferences in favor of Plaintiff, the court concludes this claim survives summary judgment.

To establish a dispute of fact on causation, an employee may point to circumstantial evidence, such as "suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). Durns here relies primarily on suspicious timing—which is rarely sufficient to create a triable issue, unless the "adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). Timing can be sufficient to establish an inference when there are "no more than a few days" between the protected activity and adverse action. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Here, where just two days elapsed between Durns's return from FMLA leave on June 4, 2018 and Lugo's decision to recommend termination on June 6, 2018, there is a triable question on this issue. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (two days supported an inference of causation); *Casna v. City of Loves Park,* 574 F.3d 420, 427 (7th Cir. 2009) (one day); *McClendon v. Ind. Sugars Inc.,* 108 F.3d 789, 796–97 (7th Cir. 1997) (two to three days).

In response, FGC first contends that the Seventh Circuit has created a "bright-line rule" that "timing alone cannot and will not save a claim from summary judgment." (Def.'s Mem. at 6.)

As the court reads the caselaw, it does not establish any such "bright line." Nor do the cases cited by FGC establish such a rule; neither of the cases FGC cites dealt with a time period of only a few days. *See Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018) (affirming summary judgment where plaintiff's primary evidence was that five months elapsed between the end of her FMLA leave and written warning); *Rowlands*, 901 F.3d at 795–96, 802 (reversing summary judgment where plaintiff offered substantial evidence of pretext and was terminated more than three months after returning from surgery).

Timing aside, FGC contends that Durns's poor performance was the reason for his termination. (Def.'s Mem. at 6–7, 8–10.) But the fact that there were grounds for criticism of Durns's work does not satisfy the court that there are no disputes concerning causation. Evidence that "ongoing failure to meet the [employer's] expectations had already made [plaintiff] a candidate for termination" does not entitle FGC to judgment as a matter of law. *See Casna*, 574 F.3d at 427 (holding that where an employer recommended termination the day after plaintiff's protected activity, "[a] fact-finder must determine whether" she was terminated because of that activity or "because her work performance was inadequate"). Though an "employer may show that the employee would have been fired even absent his [protected activity]" by offering evidence of a non-pretextual reason for termination, *Lord*, 839 F.3d at 564, the "critical question" remains "simply whether the inference of unlawful intent is reasonable." *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017).

At summary judgment, FGC notes evidence of poor performance after Durns's return from FMLA leave. In that two-day period, Lugo testified, he "looked for documentation of Durns's work" and "did not find what he expected to see." (Def.'s Mem. at 3; *see* Def.'s Reply at 7.) Similarly, in his declaration, Lugo stated that when Lugo checked Durns's electronic records after his leave, "I could not find the documentation I expected to see." (Lugo Decl. ¶ 11.) Durns's performance may well have motivated the discharge decision; but Lugo has not provided any detail concerning what documentation he expected, nor described what documentation he actually saw, nor

presented any specifics concerning the number or accuracy of any submitted records. Instead, Lugo simply asserted that the first time he checked Durns's records after his leave, they "showed nothing was entered within those two days"; but the second time he checked (presumably no more than a day later), he found "they were all late entries." (Lugo Dep. at 52:4–8.) The court is uncertain how late the entries were, or how significant the delays were, and FGC has not submitted these records on summary judgment. FGC does provide Durns's termination letter, which lists the reason for termination as failure to submit timely, accurate caseload report summaries. (Termination Letter.) For his part, Durns testified that he "was continuing to work" after returning from leave, and that he "fixed things," though he admitted that given the short time period, he "don't know what [he] fixed."[5] (Durns Dep. at 72:1–13.)

Given this record, a reasonable jury could conclude that Durns's protected activity, not any documentation problems in the very short time that elapsed after his return from leave, was the reason for his termination. FGC is correct that federal courts may not act as "a super-personnel department that second-guesses" employer decisions, including whether it was "fair, prudent, or reasonable" to evaluate Durns's performance after only two days of work. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). But FGC's offered reason for termination goes directly to whether Durns completed tasks in a timely manner. A reasonable jury could conclude that two days was not long enough to determine an issue of timeliness, and the offered reason was pretextual. Moreover, in contrast to *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674–75 (7th Cir. 2011), which affirmed summary judgment where plaintiff lodged a complaint and

---

[5]     Durns disputes FGC's assertions about his performance after suspension and FMLA leave on the grounds that "no evidence has been submitted." (Pl.'s Resp. ¶¶ 20, 36.) That argument appears to assume that the court should disregard Lugo's declaration and deposition testimony. (Def.'s SOF ¶¶ 20, 36.) Testimony based on personal knowledge has evidentiary value at summary judgment, even when it is "self-serving." *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). The court nevertheless would expect more detailed evidence concerning Durns's poor recordkeeping in support of a decision to terminate his employment for this reason.

was fired within a few days, there is no "[u]ncontroverted evidence in the record show[ing] that [FGC] regularly dismissed employees" for the same reason Durns was terminated—a documentation delay of (at most) two days. FGC points to one employee who was also fired for "deficient documentation" three weeks after Durns, but provides no information as to whether these issues were similar to Durns's.[6] (Def.'s Mem. at 8; Def.'s SOF ¶ 45.) And, unlike *Davis*, 651 F.3d at 673–74, where defendant offered evidence that plaintiff violated its "zero-tolerance" Employee Guidelines, FGC offers limited evidence of its documentation requirements, and points to no evidence clarifying its documentation submission deadlines or how strictly it enforced them. FGC's reliance on *Herrera v. Illinois Bell Tel. Co.*, No. 11 C 5762, 2013 WL 654920, at *2–5, 9 (N.D. Ill. Feb. 21, 2013), which found no retaliation despite plaintiff being suspended the same day she returned from FMLA leave, is therefore misplaced: that record contained substantial evidence of the employer's objective scoring system to review monthly employee performance, plaintiff's repeated failure to meet minimum scores, and the application of the employer's progressive discipline policy. Moreover, plaintiff offered no evidence that the decisionmaker was

---

[6]     Durns's own evidence concerning the treatment of similarly situated employees is equally unsatisfying. Durns mentioned (but did not identify) similarly situated employees in his complaint, and then, at his deposition, identified three FGC employees who held the same position he did. (Compl. ¶ 16; Durns Dep. at 30:9–31:2.) On summary judgment, FGC points to Durns's testimony that no other employee had two multiple-day suspensions between October 2017 and June 2018. (Durns Dep. at 83:3–7.) FGC also offers Lugo's testimony that these employees did not have similar disciplinary records to Durns and that one was terminated for falsifying documents, one was terminated for failing to properly document his work, and one resigned before Lugo could discipline her for poor performance. (Def.'s SOF ¶¶ 40–45.) Based on this evidence, FGC argues that these employees were not similarly situated to Durns. (Def.'s Mem. at 7–8.) Durns did not respond to the arguments, mention the comparators in his brief in opposition, or put forth any evidence of these comparators. He only disputes FGC's assertions about the comparators by stating: "Plaintiff is unable to respond to this statement of fact as it is presented without any supporting evidence other than Defendant's own self-serving declaration." (Pl.'s Resp. ¶¶ 40–45.) Assuming that Durns has not forfeited the issue, his claims about the comparators would not by themselves be sufficient to defeat summary judgment; "the record lacks enough evidence to permit a jury to find in [his] favor" on whether these employees were similarly situated to him but treated more favorably. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019).

aware of plaintiff's medical condition or FMLA leave when she decided to suspend plaintiff. *Id.* at 9–10.

Durns suggests that the record shows that FGC believed his performance was acceptable before his FMLA leave. Durns notes that his February 2018 suspension notice warned that he would be monitored for one month after suspension and that failure to improve could result in termination. That 30-day review period ended on April 12, 2018 without any further discipline. (Pl.'s Resp. ¶¶ 26–27, 31.) FGC claims this is "largely immaterial," because its reason for termination was Durns's deficient performance after leave. (Def.'s Reply at 4, 8.) Though Lugo testified that he placed Durns on a monitoring period at some point (Lugo Dep. at 43:23–44:2), FGC points to testimony from Lugo and FGC's executive officer that it could take months for Lugo to notice a staff member's poor performance. (Lugo Dep. at 30:16–31:25; Lewis Dep. at 16:16–20:12.) Thus, the absence of discipline during that 30-day monitoring period is insignificant, FGC suggests, because discipline timelines were not firmly enforced (Def.'s Reply at 7); for example, the February 2018 "six month" review occurred eight months after the June 2017 warning. But a reasonable jury could conclude otherwise. The absence of any formal discipline during a monitoring period just before Durns's leave casts a shadow on Lugo's claim that reporting delays in a two-day period showed him that Durns would never change. (Lugo Dep. at 45:23–46:4; Lugo Decl. ¶¶ 10–11.)

FGC notes that Durns himself acknowledged that his data recording on March 23, 2018 "wasn't good enough for [Lugo]." (Durns Dep. at 60:5–62:6.) But this was in the context of e-mails sent from Lugo to Durns (not part of the summary judgment record) concerning treatment plans that Durns had submitted for Lugo's review—treatment plans that Lugo ultimately approved because they "showed some improvement." (Lugo Dep. at 36:15–23.) If anything, this evidence rebuts FGC's suggestion that the 30-day review period was not significant and, because the exchange took place weeks before the review period ended, might support Durns's contention that his post-suspension performance was ultimately deemed acceptable.

A reasonable jury might well conclude that Durns's termination was justified. But in light of the circumstances surrounding the discharge—prompted by reports that were late by a few hours at most—and the timing, a reasonable jury might also question the proffered reason for termination. Cases cited by FGC can be distinguished on this basis. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 923–24 (7th Cir. 2019) (affirming summary judgment where plaintiff was terminated several weeks after her protected activity, when she violated an employment improvement plan by an unexcused absence from work); *McClendon,* 108 F.3d at 796–97 (affirming summary judgment where plaintiff's termination, just days after an EEOC complaint, was triggered by his grossly insubordinate conduct at a meeting that post-dated that complaint); *cf. Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) (affirming summary judgment on a race discrimination claim; plaintiff did not dispute the merits of disciplinary notices issued after he had reported misconduct by a supervisor).

In short, there is evidence of Durns's performance deficiencies, but a jury—not the court—must decide whether those deficiencies caused his termination. Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim (Count II) is denied.

## 2. FMLA Interference

FGC also moves for summary judgment on Durns's claim that FGC interfered with the lawful exercise of his FMLA rights. Durns did not respond to FGC's arguments or mention the interference claim in his brief in opposition. Accordingly, Durns has forfeited this claim, and FGC is entitled to summary judgment. *See Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 641 (7th Cir. 2019) (holding that plaintiff forfeited his retaliation claim by failing to assert any argument in response to defendant's motion for summary judgment on all counts); *Bishop v. Air Line Pilots Ass'n, Int'l*, 511 F. Supp. 3d 830, 847 (N.D. Ill.), *aff'd,* 5 F.4th 684 (7th Cir. 2021) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.") (quoting *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007)).

Putting aside forfeiture, the merits of Durns's interference claim are questionable. FGC argues that Durns has not shown that "[his] employer denied [him] FMLA benefits to which [he] was entitled." *Goelzer*, 604 F.3d at 993. Neither Durns's complaint nor brief in opposition identify any benefits he was denied. *See Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 827 (7th Cir. 2012) (affirming summary judgment on FMLA interference for the employer where plaintiff's supervisors decided to fire her "two months *after* [a supervisor] granted her isolated leave request and before any additional requests were made").

Defendant's motion for summary judgment on Plaintiff's FMLA interference claim (Count I) is granted.

### 3.    ADA Retaliation

Like FMLA retaliation, ADA retaliation requires a showing that plaintiff engaged in protected activity, suffered adverse action, and that there is a causal link between the two (though, unlike FMLA retaliation, there must be but-for causation). *See Rowlands*, 901 F.3d at 801. For his ADA claim, Durns points to both his FMLA leave and request for accommodation as protected activities.[7]  FGC contends that Durns failed to mention the request in his EEOC charge and thus did not exhaust his administrative remedies for this claim. (Def.'s Mem. at 5.) Durns did not respond to this argument in his brief in opposition, but whatever its merits, the court concludes any claim based on a request for accommodation fails for a different reason: Durns lacks evidence that any decisionmakers even knew of that request. When Durns returned from FMLA leave, he was medically restricted from lifting or pushing more than ten pounds; this was the only accommodation Durns needed to return to work. (Def.'s SOF ¶ 33.) This restriction was noted in the medical documentation attached to the HR director's approval of Durns's FMLA leave request. (FMLA Approval at 5.) But Lugo (who recommended termination) was not included on

---

[7]    In his briefing, Durns groups both retaliation claims together, but his complaint only mentions the accommodation request in support of his ADA retaliation claim. (Compl. ¶¶ 48, 63.)

that approval; neither was Lugo's supervisor or FGC's executive officer, who recommended or approved Durns's termination. Durns's deposition testimony does not make clear which FGC employees knew of his restriction, and Lugo testified that he was not aware that Durns required any accommodation. (Lugo Dep. at 40:2–4.) Nor did Durns suggest those restrictions had anything to do with his responsibilities as a counselor.

That leaves Durns's claim that FGC retaliated against him for exercise of his ADA rights by taking FMLA leave.[8] Because analysis of this claim is congruent with analysis of the FMLA retaliation claim, FGC's motion for summary judgment on Plaintiff's ADA retaliation claim (Count IV) is likewise denied.

## 4. ADA Discrimination

Finally, Durns alleges that FGC discriminated against him because of his disability. An ADA disability claim requires a showing that: "(1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020).

FGC disputes all three elements to varying degrees. FGC has forfeited its argument that Durns was not disabled by providing only a single "perfunctory" sentence on this issue in its opening brief. *See United States v. Sheth*, 924 F.3d 425, 435 (7th Cir. 2019). FGC states— without citation to the record or caselaw—that "[t]here is no evidence that [FGC] ever 'perceived'

---

[8]     The court notes that some courts have held that FMLA leave is not a protected activity under the ADA. *See Acker v. General Motors, L.L.C.*, 853 F.3d 784, 791–92 (5th Cir. 2017) (explaining that "an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job"); *accord Arms v. Milwaukee Cty.*, No. 18-cv-1835, 2019 WL 1981036, at *5 (E.D. Wis. May 1, 2019). The Seventh Circuit has not considered this argument, *see Arms*, 2019 WL 1981036, at *5, but it has assumed without discussion that FMLA leave is a statutorily protected activity for ADA retaliation. *See Freelain*, 888 F.3d at 901. Because FGC does not raise this argument, the court assumes FMLA leave constitutes a protected activity under the ADA.

Durns as disabled at any time." (Def.'s Mem. at 11.) Durns did not respond to this in his brief in opposition, instead claiming that the parties agree he "is disabled within the meaning of the ADA due to his cancer diagnosis." (Pl.'s Mem. at 5.) The parties' agreement aside, the court is satisfied that Durns meets this prong of the test. Under the ADA, a disability is defined as: (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019) (quoting 42 U.S.C. § 12102(1)). FGC focuses on the "regarded as" definition, arguing that even if Lugo learned of Durns's prostate cancer diagnosis when Durns returned from leave, Lugo must also "believe that [the impairment] substantially limits a major life activity." (Def.'s Reply at 12 (quoting *Maggio v. Konica-Minolta Bus. Solutions USA*, 578 F. Supp. 2d 969, 974 (N.D. Ill. 2008).) This misstates the law. The ADA was amended in 2008 to broaden the "regarded as" prong: an individual is now regarded as disabled if "he was subject to a prohibited employment action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Richardson*, 926 F.3d at 886 (quoting 42 U.S.C. § 12102(3)(A)). Cancer is an impairment. *See* 29 C.F.R. § 1630.2(j)(3)(iii).[9] Because Lugo and FGC were aware of this impairment, Durns does not need additional evidence that they believed he was substantially limited.. *See Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018) ("[I]t was error for the district court to require [plaintiff] to present evidence that [defendant] believed that [plaintiff] was substantially limited in a major life activity."). Rather, Durns must point to evidence allowing "[a] reasonable jury [to] conclude that [FGC] effectively terminated [Durns] 'because of' its knowledge of [his cancer]." *Id.* As discussed below, the court concludes that Durns has done so.

---

[9]    EEOC regulations interpreting the ADA are entitled to deference unless they are arbitrary and capricious. *Richardson*, 926 F.3d at 887.

In its opening brief, FGC also briefly contends that "the evidence is clear that Durns was not able to perform the essential functions of his job," including completing timely and thorough documentation. (Def.'s Mem. at 11.) To the extent FGC expands on this argument, it is tied to its contention that Durns's documentation issues caused his termination. The dispositive question, therefore, is whether "[FGC] terminated [Durns] because of his cancer," or because of his performance. *Castetter*, 953 F.3d at 997. The court concludes that Durns has established a triable question on this issue for the same reasons discussed earlier. Durns contends that Lugo learned of his cancer diagnosis during the days after Durns returned from FMLA leave and before he was terminated. (Pl.'s SOF ¶ 1.) Though FGC disputes this, it does not clarify when Lugo learned of the diagnosis, and offers no evidence disproving Durns's assertion. Durns did not disclose his medical condition in the e-mail to Lugo requesting FMLA leave, and Lugo was not copied on the documentation that included Durns's diagnosis. (FMLA E-Mail, FMLA Approval.) Construing the facts most favorably to Durns, the testimony supports Durns's assertion and suggests that Lugo made the termination decision promptly on learning of Durns's diagnosis. (Lugo Dep. at 37:9–39:2.)

FGC nonetheless argues that to survive summary judgment, Durns must offer additional evidence that Lugo's knowledge of this diagnosis affected his treatment of Durns. (Def.'s Reply at 12.) The cases by FGC for this argument are distinguishable. *See Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 589 (7th Cir. 2014) (holding that suspicious timing between complaint and termination did not create a triable issue where plaintiffs had been making similar complaints for six months); *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675–76 (7th Cir. 2011) (plaintiff had been making complaints for years). To establish a jury question, Durns is not required to offer additional circumstantial evidence of discrimination during the one or two days after Lugo learned he had cancer and before the termination decision. FGC's arguments that poor performance was the reason for his termination are, as before, properly matters for a jury to decide.

Defendant's motion for summary judgment on Plaintiff's ADA discrimination claim (Count III) is denied.

## **CONCLUSION**

For the reasons stated above, Defendant FGC's motion for summary judgment [30] is granted with respect to Plaintiff's FMLA interference claim and otherwise denied.

ENTER:

Dated:  September 29, 2021

_____
REBECCA R. PALLMEYER
United States District Judge